Case number 19-2143. U.S.A. v. Nabor Acosta-Barrera et al. Oral arguments not true. C. 15 minutes per side. Ms. Amanda Jowad for the appellant. Is that better? Much. Much. I apologize. I am Amanda Jowad on behalf of the United States. Actually, I don't know if you heard any of my appearance, so I'm just going to start over. Just start at the beginning. All right. Thank you. Good afternoon, your honors. Amanda Jowad appearing on behalf of the United States. I would like to reserve three minutes for rebuttal, please. Mr. Barrera was caught picking up a large sum of cash from a known member of an international drug trafficking organization. And in the vehicle that Acosta-Barrera was driving to pick up that large amount of cash, he had two important documents relating to the finances of that drug trafficking organization. One of those was a letter outlining several money pickups relating also to Mexico, the believed source of heroin for this drug trafficking organization. And the second document was a way of transferring money from one person or one place to another and can be used for international transactions as well. Counsel, let me just interrupt a minute because this is a case that's very rich in detail as far as the background goes. And the affidavit in question in this case certainly provided all kinds of information tying the defendants into a major drug operation. But the question that the district court addressed kind of really narrowed right down to walking in the door of the house and whether there was enough. You've got plenty of stuff establishing who this guy was and what he was up to. And in that regard, of course, the government filed this Sumlund memo. And there certainly is language in there that would favor your argument, but there's also some facts that are a little different too. Yes, Your Honor. So I'll move into talking about what ties Acosta-Barrera to the house. And that's role in this drug trafficking organization. And under the case law of this circuit for a high level member of a drug trafficking organization, it is a reasonable inference that they would keep record and money relating to that organization within the home or within a stash house, which is actually what the agents believed this home in Dearborn Heights was at the time. If you look at paragraphs 24 and 25 of the affidavit, the affiant concludes that this house was a stash house because when the agents and officers went to do surveillance there, they saw multiple shipping notices on the door, which led them to conclude that no one had been there in quite some time. So they had one day of surveillance. Is that correct? That's correct, Your Honor. It was approximately one day of surveillance and time was of the essence here. They didn't have a large amount of time to conduct surveillance and wait because at the time that Acosta-Barrera and Mr. Torres Alvarez were pulled over on May 3rd, they were actually taken directly into ICE custody. So knowing that several members of this drug trafficking organization were arrested, that heightens the risk that someone else could go to the house, get rid of the evidence. Once they know they're on law enforcement's radar, it's likely one of the members of the organization could have either destroyed or moved or hid any evidence in the house. So the officers had one day to kind of piece things together to conduct the surveillance at the house. They also spoke with an attorney for the landlord of the house who said that Acosta-Barrera was paying rent in cash without a lease. And all of those factors led the officers to conclude that Acosta-Barrera was trying to draw as little attention to this house as possible, which is common for currency stash houses for drug trafficking organizations. If that's where they're hiding their money, they don't want to have people coming to the house. They're certainly not going to be conducting drug deals outside. This is Judge Merritt. The court below, in Judge Cohen's opinion there, number two says, there are no facts which tie the Shirley Lane House to drug activity other than it is where likely drug dealers reside. Do you agree with that? No, your honor. First of all, it wasn't only a place where likely drug dealers resided, but it was identified by the agents in their training and experience as a stash house. You mean they had it in their mind that maybe this place was a stash house? Correct. What's the proof of that? Just something they, their experience told them that maybe that's the case. Maybe, maybe not. Well, their experience and their observations. Observations were there that would indicate that this house was connected to drug activity other than the fact that you've got these drug dealers. The problem I'm having is going into somebody's house. It could be a mistake, you know? That's correct, your honor. But the law doesn't require us to rule out any innocent explanation for the behavior that they're seeing. The officers saw that there were shipping notices on the door that no one had been there for a while, which is consistent with their view of a stash house. But I also want to point out that it's not required that there's specific, what the district court was looking for, which would be specific drug deals or observations of drugs at the house. Because this court has recognized that if there is a major player in a large ongoing drug trafficking organization, you can infer that there will be records of that drug trafficking organization in the residence. And isn't that part of the problem here, the location of the residence? One of the briefs gives us a map and draws a triangle between the three cities where I think Chicago and I'm not sure of the names, but the three cities in which the drug trafficking was going on with Mr. Torres. I mean, I know there's a lot of evidence in the record on Alvarez-Torres. And that triangular area is significantly far away from Acosta Berra's home on Shirley Road, merely because someone's pulled over with currency, a money gram, and a ledger that pretty clearly shows they're involved in drug trafficking. Why is that enough to go to a completely disparate geographical location and get a warrant to search that home? Because that's a place where Acosta Berra was returning to, albeit possibly sporadically. That's where he was paying rent. That's where he was paying for utilities. And again, the court has said that a major player in a drug trafficking organization, there is likely to be evidence in his residence. And I do... If he had had a vacation house in Florida, could you have gotten a search warrant for that? I think that would be a different situation, Your Honor. I think that would be a much tougher government. Well, if there was evidence that the residence was used for purposes of vacation, and that wasn't present here, that when they looked at that house, they concluded that it was a stash house. And in terms of distance, I also want to point the court to a case that was cited by the defendants, the Savoca case, where the court said a 2,000 mile distance is too far in a bank robbery case. It was not enough to establish probable cause, but the court still found good faith. And here, there is plenty of evidence that the officers acted in good faith and relied on reasonable conclusions in building this affidavit and relying on the magistrate. And there are cases in this circuit, recent cases, that say that it is reasonable in terms of good faith to rely on the conclusion that drug traffickers- For a minute, you're just relying on the Leon case now, right? Yes. Relying on good faith under Leon. Yes. Okay. And since we've sort of moved into talking about good faith, I do want to address the district court's conclusion that this was a bare bones affidavit. That's just simply not true. The affidavit in paragraphs 24 and 25, the officer sets out his factors of why he believes that this house is a stash house, why he believes Acosta Barrera is involved on the money side of this drug trafficking organization. So the officer's synthesizing all that he has learned and why he believes what he believes. And even if the court were to find that there was not probable cause, that synthesization that the officer went through in laying out his facts and his conclusions is what makes this not a bare bones affidavit. If you look at the definitions that have been given, if you look at U.S. v. Christian of what a bare bones affidavit looks like, it's conclusory. It merely states an affiant's belief that probable cause exists. That is not what we have here. And I know that one of your honors mentioned the Sumlin case. And those facts are a little bit different. But there was a very tenuous connection between the residents and drug trafficking in that case. And the court still held that there was probable cause. So it's hard to imagine. But didn't the court in Sumlin, didn't the court hold that there was probable cause? Because what they were seeking from that location was the cell phone that they already had some evidence would have text that would suggest that he was the person who had sold the drug that killed the woman. I mean, isn't that a different circumstance? That was that was a comment, an offhand comment made by the court. I'm not sure the court relied on that and finding there was probable cause. But here there was probable cause to search for financial documents in this house. We know that Acosta Barrera had financial documents for this organization because he held those in his car. So it is reasonable to think that there would be additional financial records in the house. And to the extent the warrant was overbroad and also seeking drugs in addition to currency and financial records, the remedy for is not to suppress the whole warrant. The remedy would be to strike any overbroad provisions in the warrant. And the government could still rely on what they found within the scope of that warrant. And the drugs would have probably been found in plain view anyway. Do you agree that what you have to show is probable cause? Is that right? That's correct. We do. To show probable cause. But if the court concludes that we have not shown probable cause, the court can find that this case falls under the exception under Leon, the good faith exception, which we believe applies to this case as well. And I believe my time is almost up unless your honors have any further questions. Any questions? Thank you. Ms. Swanson. Is Ms. Swanson next? Yes. Good afternoon, your honors. Casey Swanson on behalf of Alberto Flores Hernandez. I would like to reserve seven minutes for my co-counsel. 42 years ago, the Supreme Court in Zurcher held that the critical element in a reasonable search is not that the owner of property is suspected of crime, but that there is reasonable clause to believe that the specific things to be seized are located in the property to which entry is sought. In this case, the warrant doesn't provide sufficient facts to demonstrate that any evidence of criminal activity was being stored at the Shirley Lane residence, that any criminal activity had occurred at the Shirley Lane residence, or that Nabora Costa Barrera had engaged in criminal activity at the residence or elsewhere. There was no probable cause for the search warrant to issue, and it was unreasonable for any police officer to believe otherwise. It's important to understand the context of statements like, we can infer a nexus between a drug dealer's home and evidence of their crimes. This court first made the statement in the case of drug dealers, evidence is likely to be found where they live in United States versus Jones in 1998. And I think it's important to understand the facts there. In that case, the court was dealing with a search warrant to search the defendant's home after a confidential informant had come forward and told the police that they had engaged in multiple narcotics transactions with the defendant. The police set up controlled buys, and those controlled buys took place right outside of the home, in the car, in the driveway, not inside of the home, but near the property. And in that case, the defendant argued that there was no nexus because the confidential informant and the police were never actually inside of the home, they were outside of the home, on the yard or in the driveway. And the court disagreed, but it didn't rely on the idea that a nexus can be inferred because it's a drug dealer's home. It relied on the facts that were in the affidavit about the confidential informant and about the previous purchases and about the controlled buys. And the facts there aren't unlike many of the facts that creep up in cases where the court makes similar statements to the inference comment in Jones. And none of the facts in any of those cases that the government relies on are present here. In this case, we don't have transactions occurring in or near the house. We don't have any confidential informants or any controlled buys. We don't have any criminal history or any witnesses who have purchased any drugs from the defendant. We don't have any conversations about distribution quantities of narcotics or even of narcotics at all. Factually, this case is most similar to Brown. But in Brown, there were even more facts than what we have here in this affidavit. In Brown, the defendant was seen in a vehicle with someone that police believed to be a narcotics trafficker, not unlike this case. But in that case, there were drugs found in the car. There were text messages on a phone that police believed to be the defendants regarding possible distribution or at least prices of narcotics that police believed were going to be trafficked by the defendants. And most importantly, the defendant and the person that police believed to be a narcotics trafficker were on their way to a controlled buy when they were pulled over and stopped by police. And we don't have any facts like that here. Your opposing counsel, I think, is positing this being a money man is creating a different circumstance. And Brown did reference that where there's overwhelming evidence and cited some conspiracy or as a major player. What is the rule that you would have us look to in the situation where you don't have a street level dealer, but you've got somebody higher up in the hierarchy? I don't think that a bright line rule stating that an inference can be or that an inference can exist, that there's a nexus implied between a drug dealer and a drug dealer's home. I don't believe that that can exist because it's always a totality of the circumstances approach when it comes to probable cause, number one. And number two, I believe that such a holding would be contrary to the Supreme Court's rule in Zurcher. There needs to be a between the evidence sought and the place to be searched. And here we don't have that. And if it didn't exist in Brown, I don't believe it exists here. I'm struggling not with a bright line rule, but with what components would be necessary. The argument here is caught with a lot of money, caught with a money gram receipt and caught with a ledger. And what about that or what sort of explanation would you have about the components of a test that one might look to in the situation that's argued by your opposing counsel? I just want to make sure that I understand the question. Is the court asking about specifically as it relates to money careers? Yes. Take that as an example because I agree it's always a totality of the circumstances. I'm looking to understand a response to the claims that these three loan items are sufficient to go to someone's home and do a search. So tell me either what else needs to be considered or why these are insufficient? Well, I think they're insufficient because in every case where an inference is mentioned, there's more evidence than that. There's more facts and the information is more incriminating, number one. Number two, I do think that it's different when we're talking about money carriers. The government has, I think, sort of promoted Noboro Costa-Verera throughout the course of this case. This warrant does say that he's a money courier, not a high up financial officer within a drug trafficking organization. He's a money courier, which means that just by the definition of a courier, money is transported. Not that it's stored, not that records are being kept at his home or that he's in charge of all of the government or all of the finances or the drug trafficking organization. I think that money couriers are different than drug traffickers in that sense. Counsel, could you address the Leon problem in this case, the good faith problem? I understand you've got a stronger case, perhaps, but the Leon situation troubles me about why this isn't good faith. Leon, you know, says that exclusionary rule doesn't bar the admission of evidence seized in reasonable good faith reliance on a search warrant and is subsequently held to be defective. This seems like to be pretty problematical under your, in this case. What do you think? To that Judge Merritt, I would say that neither this nor the Supreme Court has ever found that a warrant as deficient as this was supported by probable cause or executed in good faith. And for that reason alone, I believe the warrant was not executed in good faith. We don't have to have a case right on point from the Supreme Court in order, you know, they expect us to make a little law, too, to apply this. I mean, that's the problem. No cases are not the same. But here, the argument that the government was acting in good faith. What do you think? Each case though, where good faith saves the warrant, there are some facts that the officer can use to believe that there might have been probable cause, even if mistaken. And we just don't have that here. What about the argument that both people in the car indicated that he was the money man? Both Flores, the passenger who lives at Shirley, with Acosta, and evidently Acosta Barrera himself, indicated something about him being in the car to receive the money. Is that not an additional factor to the three physical items found? I think that the statement dropping off the money is different than admitting to being a money man. And I also think that it doesn't get around the geographical problem of where that happened. Again, it was 300 miles away from the home that was ultimately searched. And I see that my time is up. We thank you. Ms. Achenbach, am I pronouncing that incorrectly? No, Achenbach, that's correct. Thank you. Good afternoon, Your Honor. Stephanie Achenbach on behalf of Mr. Acosta Barrera. I just wanted to point out, first of all, Ms. Swanson did a great job putting forth her client, Mr. Flores Hernandez's position, which is of course similar to mine. And I concur with her statement. So I will keep my portion of the argument very short. I think something that's getting lost here is in the facts. At the time that my client was pulled over in Chicago, Illinois, Mr. Alvarez-Torres was in the vehicle. He was the subject of the agent's investigation for a period of six months. On the day that my client was stopped, he was identified in the warrant as an unidentified subject. And then later in the warrant, the affiant said that he believes that my client may be a money courier for a major drug trafficking organization. Then as we move through the district court and the government's briefs, they indicate that my client is involved with possibly drug trafficking as well as money laundering. He's a suspected drug trafficker. Not until we're on appeal here was he ever identified as a high-level operative in a large drug trafficking organization responsible for keeping and shipping the organization's money and maintaining financial records. My client is a young man. He's in his early twenties. He's a high school dropout. At the time that he was stopped, there were no drugs in his vehicle. He does not have any prior criminal history, and he's been in the United States since the age of five. He's married with three children that are all very young. The government's case doesn't involve any links to his home involving informants, involving controlled buys. There's no phone information tying my client into anything drug-related other than the fact that he was stopped in Chicago. At the time that he was stopped, the registration on his vehicle, as well as his driver's license, gave his address in Dearborn Heights, Michigan. When the agents did surveillance on that home, the only thing they found were some shipping addresses that he hadn't picked up packages, but he'd already been arrested and was being held in Chicago. So the address was correct. When they checked with the landlord, the landlord acknowledged that he was renting the home. He was paying the rent and cash, but that has to do with the fact that he's an illegal alien, not that he was trying to avoid the government. There were plenty of legal connections to this home that were not criminal. In fact, the district court pointed out what they saw at the home was nothing, let alone criminal activity. So I think that's the concrete, reliable facts that this home was tied to criminal activity, and they don't have it here. They don't have any information that my client is a drug dealer, let alone a well-known drug dealer high up in a major organization. And I think that's also the fatal flaw as to why the good connection between the facts in this case and my client's home some 300 miles away in Michigan. What do you feel about the Sumlin case? Well, so the issue with the Sumlin case is, as the court pointed out, the defendant in that case had prior drug convictions coupled with recent reliable evidence of drug activity. And that's kind of what makes it different. The bulk of the cases that the government is relying on involve known drug dealers, or they involve reliable information. They involve officers that witnessed controlled buys. They involve reliable informants who gave information that then upon further investigation, they were able to establish that the informant's information was accurate. I mean, here we don't have any of this. This was paragraph 16 of the search warrant is the first and only time that my client was ever mentioned. Well, there was evidence of recent drug activity, though. No, that was Mr. Alvarez-Torres, who was in the vehicle with him. Yes, but and what was found in the vehicle and the money gram and the other things. But that could have been Mr. Alvarez-Torres, because he was in the vehicle too. Correct. And then the statements that my clients made were, you must have been following Alvarez-Torres, and Alvarez-Torres said, I was dropping off money. But those statements alone, I believe, were exaggerated to now somehow take on a criminal meaning. Which is very similar to the Brown case. I mean, in the Brown case, because of the multiple vehicles that were at issue, the vehicle that Mr. Brown was actually stopped in did not have the drugs. That would have been the Silverado truck. But the vehicle that he was stopped in with one of the defendants had the four cell phones, and he himself had $4,000 cash. Now, we don't know how much cash was involved in this case, because it wasn't in the warrant. And it looks like I have a minute left, so if any of the judges have questions, I'd be happy to try and answer. All right. No further questions? Rebuttal? Yes, Your Honors. I'd like to clear up why the government thinks that Acosta Barrera is a high level money man for this organization. And that's because he was caught red-handed picking up a large sum of money in a car with documents relating to drug transactions for the organization. We don't need a confidential informant to tell us about Acosta Barrera's activities when we have Acosta Barrera with the money coming from a known drug trafficker, and then he has receipts that lead to more money. So that's why the government feels he is in a high level position. He's entrusted with large amounts of money. If he was a one-time courier, he wouldn't be driving around in a car with someone that's as high up as Torres Alvarez. He would pick up the bag and take it to the next destination, and there would be no need for records. There would be no need to keep a ledger keeping track of the finances for the organization. So what is his connection to this house? He was the one paying rent there and paying for utilities there. And under the exception carved out in Brown, the government does not need to show that the residence was used in drug trafficking if there is overwhelming evidence that he is a major player in an ongoing drug trafficking organization. And that's exactly what we have here. You say he was paying for the house, the rent? Yes, your honor. He was paying the rent and he was also paying for utilities at that location. The footnote in Brown that references that there's overwhelming evidence in the record, aren't those cases distinguishable? I know the Kenny, it was the meth cook himself that was the defendant. In Miggins, it was a large-scale drug traffickers and gang members with a whole variety of aliases. And in Gunter, they were distributors of large quantities of the drugs. So why does he fit in the idea of going into someone's home without connection to that home? Why does Acosta Barrera fit within those cases that define that exception? Because of his level in this drug trafficking organization and his role of keeping the financial records. We know he keeps the financial records because he kept them in his car. And that means he's more likely to have the records, more likely than not likely to have those additional records in his home or to have the money in his home. His role in this organization gave the agents the probable cause they needed to get into. Here's my question though. There had never been a six month, a big nationwide kind of conspiracy that was being investigated. But his name had never come up before. Isn't that correct? That's true, your honor. The first time that he came on the law enforcement radar was that traffic stop. And if he had just been picking up money from Torres Alvarez and that was it, there probably wouldn't be sufficient probable cause. But because he was not only picking up the money, but he had financial records in his car, that's what makes it likely that he will have additional financial records. Because clearly he was responsible for keeping track of the whereabouts of the finances of this organization. Remind me about the money gram. Did the money gram have his name on it? It did not have his name on it, but it had an address listed on it. And when the agents searched that address, they found more cash. But remember your honor, the money gram was found in the center console of Acosta Barrera's own car that he was driving. Most people don't keep things in someone else's center console. So he had that money gram, he had the ledger, and these facts are sufficient to establish probable cause and at the very least are sufficient to show that the officers relied on the warrant in good faith. Let me ask this question, refresh my recollection on something. He was actually, at the time this warrant was executed, he was actually in custody, as I recall. Was he at that time in custody solely because of his immigration status or was he also in custody with some sort of a narcotics charge? My understanding is that he was solely in custody, in ICE custody, because of his immigration status. Okay. I have one other question. I understand your argument that there was concern that someone might come and remove evidence from the house, but I'm trying to understand the investigation that could have continued even if someone else came into the house, then couldn't that person be tracked? I'm wondering why there was this concern that someone would destroy evidence when there was no one else in the house and the police officers were out front and would see whoever came or went. Well, they may not have been out front 24-7. We don't know how long they could have stayed there, when that person would have come. It's up to the police, though, before they go and try to get The Supreme Court has cautioned us to not look in hindsight and say, why wasn't this done and point out all the deficiencies in an affidavit, but rather to look at what an affidavit does establish. Our position is that the officers established probable cause to search the house and at the very least relied on it in good faith. We thank you all for your very helpful arguments and briefing. The case will be taken under and in due course. That is the last of our argument cases. The remaining are on briefs. You may take a bow of this and move us into the other room and you may dismiss court.